UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION
CASE NO. 7:10-cv-00125-ART


COMMONWEALTH OF KENTUCKY                          INTERVENING PLAINTIFF
 by and through ENERGY AND
ENVIRONMENT CABINET



VS.                          COMPLAINT IN INTERVENTION
                        FOR DECLARATORY AND INJUNCTIVE RELIEF


UNITED STATES                                        DEFENDANTS
ENVIRONMENTAL PROTECTION
 AGENCY
1200 PENNSYLVANIA AVE, NW
WASHINGTON, DC 20460
and

LISA JACKSON, or her successor in office,
 in her official capacity as
ADMINISTRATOR of the
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY
1200 PENNSYLVANIA AVE, NW
WASHINGTON, DC 20460


* * * * * * * * * * *

COMES THE Intervening Plaintiff, Commonwealth of Kentucky, by and through the

Kentucky Energy and Environment Cabinet, by counsel, and for its Complaint in Intervention,

states the following:

1.      This action arises under the Federal Water Pollution Control Act ("Clean Water

Act" or "CWA"), 33 U.S.C.A. §§ 1251- 1387,  CWA §§ 201- 607.

1

## I. INTRODUCTION

2.      The Clean Water Act prohibits the discharge of any pollutant to the waters of the United States without a permit issued pursuant to the National Pollutant Discharge Elimination System (NPDES) program. 33 U.S.C. § 1342(a), Clean Water Act ("CWA") § 402(a).  Effluent limitations are imposed in the permit in order to control the amount of pollutants discharged. EPA initially issued all NPDES program permits. Subsequently, EPA has delegated to qualifying states the right to issue NPDES Permits within their state boundaries.  The Commonwealth of Kentucky was delegated authority to issue NPDES permits in 1983.   The Cabinet issues Kentucky Pollutant Discharge Elimination System (KPDES) permits within the borders of the Commonwealth, subject to EPA review pursuant to the "National Pollutant Discharge Elimination System Memorandum of Agreement Between the Commonwealth of Kentucky and the United States Environmental Protection Agency Region IV" ("MOA").  *See,* MOA attached hereto as Exhibit 1.

3.      It is Congress' stated intention to "recognize, preserve and protect the primary responsibilities and rights of states to prevent, reduce and eliminate pollution."  CWA § 201(b), 33 U.S.C. § 1251(b).  EPA has no authority to establish water quality standards *unless* the Administrator of EPA "determines that a new or revised standard is necessary to meet the requirements of" the Clean Water Act, and then only through formal notice and comment rule making under the Administrative Procedures Act. CWA § 303(c)(4), 33 U.S.C. § 1313(c)(4).

4.      Discharges to the waters of the Commonwealth from coal mine operations must qualify for coverage under either the Coal General Permit, KPDES Permit No. KYG040000, or under an individual permit.

5.      In a NPDES/KPDES permit there are two types of limits imposed in order to

control the pollutants discharged in the effluent:  technology-based limits which are imposed through the application of effluent limitations guidelines promulgated by EPA pursuant to Clean Water Act § 301, 33 U.S.C. § 1311, and water quality-based effluent limitations which are based on water quality standards established and implemented by the states pursuant to CWA § 303, 33 U.S.C. § 1313.

6.     The states, as Section 402 permitting authorities, determine in the first instance whether a proposed discharge will, after complying with the technology-based effluent limitations, have a reasonable potential to cause an in-stream excursion above a numeric or narrative criterion within an applicable water quality standard, *see* 40 C.F.R. 122.44(d).  This determination is known as a "reasonable potential analysis" or "RPA". [1] When application of a technology-based effluent limitation will not ensure the discharge complies with applicable state water quality standards, the state must develop water quality-based effluent limitations to comply with those water quality standards.  CWA § 303, 33 U.S.C. §1312.

7.      Pursuant to Congress's allocation of authority under the CWA, the Commonwealth of Kentucky has the authority to establish water quality standards that it determines will best protect the overall well-being of Kentucky's waters. Kentucky has promulgated both numeric and narrative water quality standards, including:

(a)     401 KAR 10:031, Section 4(1)(f).  "Total dissolved solids or specific conductance shall not be changed to the extent that the indigenous aquatic community is adversely affected."

(b)     401 KAR 10:031, Section 2.   "Surface waters shall not be aesthetically or otherwise degraded by substances that …injure, are chronically or acutely toxic to or produce adverse physiological or behavioral responses in humans, animals, fish and other aquatic life."

---

[1] Kentucky's "Permitting Procedures for Determining "Reasonable Potential"", May 1, 2000, were approved by EPA on July 7, 2000. *See*, attached hereto as Exhibit 2 , letter dated July 7, 2000 to R. Bruce Scott.

8**.**     Kentucky's water quality standards were approved by EPA as recently as August 1, 2010.

9.     Notwithstanding the States' primacy under the Clean Water Act in developing water quality standards, and without promulgating a standard through required notice and comment procedures, EPA has since April 1, 2010 unlawfully reviewed, and objected to, KPDES permits proposed for coal mining operations in six Appalachian states[2], including Kentucky, for compliance with an unpromulgated water quality standard for conductivity.

10.     Kentucky has had primacy to issue NPDES permits in the Commonwealth since 1982. EPA has been reviewing NPDES permits issued in Kentucky for coal mining operations since 1983 and has never, before issuance of EPA's Detailed Guidance on April 1, 2010 (described further, below) objected to a permit.

11.     Kentucky revised and re-issued its Coal General Permit, effective August 1, 2009. EPA approved the Coal General Permit, KPDES KYG0400000 in June, 2009.

12.     EPA has approved Kentucky's 305(b) reports[3], including its method of assessment and interpretation of Kentucky's narrative water quality standard for conductivity, each year since 1983.

13.     Kentucky's water quality standards, including its narrative standard for conductivity, was most recently approved by EPA on August 31, 2010.  Such approval is a determination by EPA that such standard is consistent with the requirements of the Clean Water Act.  CWA § 303, 33 U.S.C. § 1313(a)(1).

14.     Kentucky law prohibits the use of "guidance" to implement  regulatory programs. KRS 13A.130.

_____

[2] Those states are West Virginia, Virginia, Pennsylvania, Tennessee, Alabama, and Kentucky.
3Prepared and submitted pursuant to 33 U.S.C. §  1315, CWA § 305.

15.     The Kentucky Energy and Environment Cabinet intervenes herein and brings this complaint to challenge recent actions by the Defendants, and in particular the reliance by EPA upon its April 1, 2010 document entitled "Detailed Guidance: Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act and the Environmental Justice Executive Order" (hereinafter, "Detailed Guidance") in its review, comments, and objections to draft Kentucky Pollutant Discharge Elimination System ("KPDES") permits proposed by the Cabinet pursuant to KRS Chapter 224 and the Clean Water Act. *See,* attached hereto as Exhibit 3, an accurate copy of the Detailed Guidance.

16.     The Commonwealth brings this action on behalf of its sovereign interest in its rights to due process, equal protection, and protection from arbitrary action, and its interest in protecting the Waters of the Commonwealth and in protection of the state's economic interests.

17.     The Commonwealth also brings this action *in parens patriae* on behalf of its citizens whose economic welfare and general well-being, rights to due process, and equal protection are threatened by Defendants' actions.

## II.      JURISDICTION AND VENUE

18.      This action arises under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C.A. §§ 1251-1387,  CWA §§ 201- 607,  and the  Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et. seq.*, and 701 - 706.

19.      The Court has jurisdiction of this Complaint based on a federal question, pursuant to 28 USC §§ 1331 and 1346(a)(2).  Jurisdiction in this matter is conferred under 5 U.S.C. § 702 of the APA and under 28 U.S.C. §§ 2201 and 2202 for the purposes of granting the declaratory and injunctive relief sought herein.

20.      Venue is proper in Pikeville pursuant to 28 U.S.C. § 1391(e) because a substantial number of the permits objected to by the Defendants are located in the eastern part of Kentucky, in which this court is situated.

## III.      THE ADMINISTRATIVE PROCEDURES ACT

21.      Under the APA, a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Parties may bring suit "in a court of the United States seeking relief other than monetary damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *Id.*

22.      The APA allows a court to set aside agency actions that are "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when it violates federal statutes, such as the CWA.

23.     Section 553 of the APA establishes notice and comment procedures for federal rulemaking. *See* 5 U.S.C. § 553. This procedure ensures that the public receives notice of proposed agency rules or amendments and allows the public or other interested parties "an opportunity to participate in the rule making through submission of written data, views or arguments . . . ." *Id.* § 553(c).

24.     When agencies make substantive revisions to applicable regulations without following formal APA-rulemaking procedures, they violate the APA.


III.     **THE PARTIES**

25.     The Kentucky Energy and Environment Cabinet is an executive agency of the Commonwealth of Kentucky, with its central offices located in Frankfort, Kentucky.

26      The Cabinet is specifically authorized by KRS 224.16-050 to issue federal permits pursuant to 33 U.S.C. § 1342(b) of the Federal Water Pollution Control Act, subject to the conditions set out in the Clean Water Act, §§ 33 U.S.C. §§ 1342(b) and 1342(d).

27.     The initial Plaintiff in this action, Kentucky Coal Association ("KCA"), based on information and belief,  is a trade association representing the interests of the coal mining industry and related businesses throughout the Commonwealth of Kentucky.

28.     Defendant, EPA is a federal agency charged with administration and enforcement of many of the federal environmental laws, including the Clean Water Act. EPA's principal place of business and its headquarters is in Washington, DC.

29.     Defendant, Lisa Jackson, sued herein in her official capacity as the Administrator of EPA, has ultimate authority and responsibility for the acts of the EPA.  Her principal place of business is at EPA's headquarters in Washington, DC.

## IV.    STANDING

30.     The Commonwealth of Kentucky has standing to bring this action on the grounds that Defendants' actions in unlawfully objecting to the Cabinet's NPDES permits have caused the Commonwealth to suffer a concrete and particularized injury, by preventing the exercise of its rights provided by the Clean Water Act to prevent, reduce, and eliminate pollution and to plan the development and use of the Commonwealth's water resources and to consult with the Administrator in the exercise of her authority under the Clean Water Act.

31.     The Commonwealth has suffered actual harm in that Defendants' actions have prevented the Commonwealth from implementing its right under the Clean Water Act to protect water quality within its borders and to assess the health of its waters, and by denying the Commonwealth's due process right to comment on and otherwise participate in rulemaking by federal administrative agencies, as required by federal law.

32.     That the injury to the Commonwealth is a direct result of Defendants' actions in imposing a rule on the issuance of NPDES permits by the Commonwealth that has not been lawfully promulgated through the notice and comment procedures required by federal law.

33.     That a decision in the Commonwealth's favor enjoining Defendants' use of the Detailed Guidance to object to Kentucky's NPDES permits will make such objections less likely, and thus the Commonwealth will be able to exercise the authority granted it by the Clean Water Act to apply its promulgated water quality standards to such permits.

34.     The Commonwealth also has standing *in parens patriae* to bring this action on behalf of its citizens who will suffer grave harm due to Defendants' actions in objecting to state NPDES permits without regard to state law and without the notice and comment required by federal law.

35.     Defendants' wrongful actions will have a grave and detrimental effect on the welfare of Kentucky citizens who rely on the economic stability provided by the wages and taxes paid by the coal mining industry and ancillary businesses, including those citizens residing in the Appalachian region of Eastern Kentucky.  EPA's implementation of its Detailed Guidance to delay and object to KPDES permits on the basis of an unpromulgated rule serves to disadvantage Kentucky coal mining operations and the citizens of the Commonwealth relative to non-Appalachian coal states.  Such disadvantage will have a profound effect on Kentucky's economy and its citizens.  Defendants' actions also have denied Kentucky's citizens the rights to notice of, and opportunity to comment on, EPA proposed rulemaking.

36.     A decision in the Commonwealth's favor enjoining Defendants' use of the Detailed Guidance to object to Kentucky's NPDES permits will make such objections less likely, and enable the Commonwealth to issue NPDES permits and so preclude the detrimental economic impact on Kentucky's citizens threatened by Defendants' actions.


## V.     THE CLEAN WATER ACT AND KENTUCKY LAW

37.     Pursuant to Kentucky Revised Statutes ("KRS") 224.10-100 and in addition to all other powers and duties vested in the Cabinet, the Cabinet has the authority, power, and duty to:

> Develop and conduct a comprehensive program for the management of water, land, and air resources to assure their protection and balance utilization consistent with the environmental policy of the Commonwealth;
>
> Provide for the prevention, abatement, and control of all water, land, and air pollution…;
>
> Provide for the control and regulation of surface coal mining and reclamation in a manner to accomplish the purposes of KRS Chapter 350 (State Surface Mining Regulation and Control Act)

Appear and participate in proceedings before any federal
regulatory agency involving or effecting the purposes of the Cabinet; and

Issue, continue in effect, revoke, modify, suspend, or deny under
such conditions as the Cabinet may prescribe and require that applications
be accompanied by plans, specifications, and other information that the
cabinet deems necessary for:

Permits to discharge into any waters of the Commonwealth

38.     KRS 224.70-100 identifies the Commonwealth's policy and purpose regarding

water quality:

(1)     It is hereby declared to be the policy of this Commonwealth
to conserve the waters of the Commonwealth for public water supplies, for
the propagation of fish and aquatic life, for fowl, animal wildlife and
arboreous growth, and for agricultural, industrial, recreational, and other
legitimate uses; to provide a comprehensive program in the public interest
for the prevention, abatement and control of pollution; to provide effective
means for the execution and enforcement of such program; and to provide
for cooperation with agencies of other states or of the federal government
in carrying out these objectives.

(2)     The following are among the purposes of KRS Chapter
224: to safeguard from pollution the uncontaminated waters of the
Commonwealth; to prevent the creation of any new pollution of the waters
of the Commonwealth; and to abate any existing pollution.

39.     To implement this policy and in the public interest, the Kentucky Legislature has

established a comprehensive statutory and regulatory scheme pursuant to the Clean Water Act

and its implementing regulations governing the permitting of wastewater discharges to the waters

of the Commonwealth, including discharges from coal mining operations.

**VI.     EPA'S REVIEW OF SECTION 402 KPDES PERMITS PRIOR TO ISSUANCE OF THE DETAILED GUIDANCE**

40.     The facts alleged in the Complaint for Declaratory and Injunctive Relief initiating

this action and filed on behalf of the Kentucky Coal Association are incorporated herein by

reference.

41.     On or about February 14, 2008, EPA and the Commonwealth of Kentucky, entered into a Memorandum of Agreement relating to Kentucky's administration of the Section 402 NPDES permitting program The MOA specifically recognizes that "[t]he Cabinet has the primary responsibility to establish the State NPDES program priorities" and the Cabinet is charged with "ensur[ing] that the conditions of a draft permit are written in compliance with the applicable water quality standards of all affected states…" *See,* Exhibit 1, *infra.*

42.     The MOA sets forth the process by which a draft Section 402 KPDES permit is submitted for review to EPA and issued by the Cabinet, and the time periods which govern the process.  EPA may submit comments to a draft permit, or object to its issuance.  If EPA only comments on the permit, the Cabinet can proceed to issue it.  In the event EPA files an objection to a permit it shall include the specific grounds for the objection, including "the reasons for the objection, and the sections of the CWA or regulations which support the objection, and the actions which must be taken to eliminate the objection, including, if appropriate, the effluent limitations and conditions which the permit would include if it were issued by the Regional Administrator.  The EPA objection must be based upon one or more of the criteria identified in 40 C.F.R. §123.44(c)." If EPA objects to the permit, the state may not issue the permit.  The state may request a hearing, but if it does not do so or otherwise appropriately respond to the objection within the required deadlines, exclusive authority to issue the permit passes to EPA.  40 C.F.R. § 123.44(h)(3)

43.     In early 2009, the Kentucky Department for Environmental Protection, Division of Water ("KDOW"), the specific division within the Cabinet charged with review, issuance or denial of Section 402 KPDES permits, issued a draft of the current version of the Coal General Permit.

44.     Consistent with the MOA, on April 3, 2009, EPA wrote KDOW with comments about the draft General Permit, including its concern that "[r]ecent studies have shown that there is a direct correlation between stream impairment and discharge of TDS/SC due to coal mining and coal processing," citing a 2008 study[4], and requesting that the General Permit be revised to include additional data submission and monitoring requirements for specific conductance (SC) and total dissolved solids (TDS) that would enable KDOW to determine whether surface coal mine operators subject to coverage under the General Permit may cause or contribute to violations of Kentucky's water quality standards.  EPA asked KDOW to withdraw the draft General Permit and to develop a new one, with input from EPA, "that would be consistent with the requirements of the Clean Water Act."  (*See* April 3, 2009 Letter, attached hereto as Exhibit 4).

45.     KDOW did  revise the General Permit to address the concerns raised in EPA's April 3, 2009 letter, adding several new requirements, including effluent and in-stream chemical monitoring and in-stream biological monitoring.  On May 15, 2009, KDOW sent EPA the revised proposed General Permit.

46.     On or about June 16, 2009, and within thirty (30) days of its receipt of the revised General Permit, EPA sent a letter to KDOW which stated "[i]n accordance with the EPA/Commonwealth of Kentucky NPDES MOA, we have completed our review of the above draft permit and have no objections to the proposed permit conditions. The draft permit satisfies EPA's concerns that were discussed in our April 3, 2009 letter to KDOW."  (*See* June 16, 2009 Letter, attached hereto as Exhibit 5). KDOW issued the final General Permit following its receipt

---

[4] Pond, G.J., M.E. Passmore, F.A. Borsuk, L. Reynolds, and C.J. Rose. 2008. Downstream effects  of mountaintop coal mining: comparing biological conditions using family- and genus level macroinvertebrate bioassessment tools. *J. N. Am. Benthol. Soc*. 27(3):717-737 (the "Pond-Passmore study").

of this June 16, 2009 letter from EPA voicing no objections to its issuance.

47.    In late 2009, and early 2010, and in the context of numerous discussions with EPA, KDOW also proposed to issue numerous Section 402 KPDES individual permits ("Individual Permits") for coal mining activities in Kentucky.  Like the Coal General Permit, these permits included requirements for effluent and in-stream chemical monitoring and in-stream biological monitoring, as well as whole effluent toxicity (WET) testing.  The Cabinet did not have sufficient data regarding conductivity and dissolved solids from the new or expanded sources with which to conduct an RPA for these pollutants. However, the permits provided that the RPA would be conducted after issuance of the permit based on the actual, site-specific data generated from the permitted site. Each permit also included a re-opener clause allowing KDOW to impose new permit conditions, including numerical effluent limits, upon the receipt of new data and completion of a RPA.

48.    KDOW's approach – conducting the RPA from site-specific data generated from a new or expanded discharge after issuance of the permit, along with inclusion of a permit reopener for the potential future imposition of effluent limits - is fully consistent with EPA's recommendations to state permitting authorities in its *Technical Support Document for Water Quality-Based Toxics Control,* applied since it was issued by EPA in 1991, and with Kentucky's "Permitting Procedures for Determining "Reasonable Potential"", May 1, 2000 which were approved by EPA on July 7, 2000. *See,*  Exhibit 2, *infra*)

49.    EPA did not object to the pending Section 402 KPDES Individual Permits, which would have prevented their issuance.  Instead, from December 21, 2009 through March 18, 2010, EPA sent comment letters to KDOW with recommendations on the numerous Section 402 KPDES Individual Permits.  In those comments, EPA asserted that there was a reasonable

potential that discharges from surface mining activities will cause or contribute to an excursion of Kentucky's narrative water quality standard for conductivity, citing the Pond-Passmore Study; and recommending that an RPA for specific conductance and total dissolved solids be conducted and that water quality-based effluent limitations also be included in the permit.

50.     KDOW responded to EPA's comments by indicating that the permits contained requirements for the collection of necessary site-specific data to perform the RPAs, along with permit reopeners to add numeric water quality effluent limits as necessary.  (*See e.g.*, March 19, 2010 Letter to EPA, attached hereto as Exhibit 6).

51.     On March 19, 2010, KDOW issued the numerous Section 402 KPDES Individual Permits for coal mining facilities without objection by EPA.  By not objecting to these permits, EPA acknowledged that they complied with CWA requirements.

52.     Thus, prior to EPA promulgation of the Detailed Guidance on April 1, 2010, discussed below, EPA did not object to the Section 402 KPDES General Permit or Individual Permits, none of which provided numerical effluent limits as a method of implementing Kentucky's narrative water quality standards for conductivity or toxicity. Nor did the Section 402 KPDES Individual Permits provide for conducting an RPA for conductivity, total dissolved solids or sulfates at the time of permit issuance, but instead provided for a post-permit RPA using site-specific data, and a permit re-opener clause.

53.     In fact, as stated above, EPA had never objected to issuance of a Section 402 KPDES permit for coal mining activities in Kentucky since Kentucky gained permit issuing authority in 1983.  EPA's oversight of Section 402 KPDES permits changed, markedly, after EPA issued its Detailed Guidance on April 1, 2010.

## VII.   EPA'S REVIEW OF SECTION 402 KPDES PERMITS AFTER ISSUANCE OF THE DETAILED GUIDANCE

54.     The facts alleged in the Complaint for Declaratory and Injunctive Relief initiating this action and filed on behalf of the Kentucky Coal Association is incorporated herein by reference.

55.     On April 1, 2010, EPA released its Detailed Guidance to EPA Regions 3, 4 (which includes Kentucky) and 5 for their review of Appalachian coal mining activities, including their review of Section 402 NPDES permits issued by states.  Concurrent with its release, EPA published the Detailed Guidance in the Federal Register for public comment.  75 Fed. Reg. 18500.  EPA characterized the document as "final interim guidance" and announced that it would issue final guidance after receipt of public comments and the results of an external peer review by  the Science Advisory Board.  It further asserted that it is "not a regulation" and "does not impose legally binding requirements on EPA."

56.     Such disclaimers are inconsistent, however, with EPA Director Jackson's public pronouncements at the time of the issuance of the Detailed Guidance that "no, or very few valley fill … are going to meet this standard." It is also inconsistent with the language of the Detailed Guidance as a whole, which is replete with pronouncements on what regional administrators should do in the course of reviewing Section 402 NPDES permits, including a recommendation to object to those permits if they do not contain the specific limitations contained in the Detailed Guidance.   This document states on its face that it would serve in "clarifying EPA's expectations" and that it is "effective immediately" and that EPA expected Regions 3, 4 and 5 to "begin using this interim final guidance immediately in your review of Appalachian surface coal

mining activities." (*Id.* at 1-2.)  In fact, EPA's national office has not granted the relevant Regional Offices discretion on the use of the Detailed Guidance.  Upon information and belief, Region 4 has been instructed by its national headquarters to delay or otherwise obstruct the issuance of any Section 402 KPDES permit for surface coal mining facilities in Eastern Kentucky submitted by KDOW to EPA for review after April 1, 2010 that does not incorporate the provisions of the Detailed Guidance.

57.     In particular, the Detailed Guidance asserts that state Section 402 NPDES permits it had reviewed "did not incorporate provisions that would implement the relevant narrative water quality standards relating to discharges that increase the levels of conductivity, total dissolved solids and sulfates."  EPA found state permits to be deficient in two principal ways: (a) the state permitting authority had not conducted a sufficient RPA  at the time of permit issuance; and (b) even in the absence of an RPA,  "available science" supplied a sufficient causal link for state permitting authorities to determine that coal mining discharges which increase conductivity, dissolved solids or sulfates would likely violate narrative water quality standards" and thus EPA concludes in the Detailed Guidance that such permits should have contained effluent limits for these pollutants.  (*Id.* at 8.)

58.     While post-permit RPAs coupled with a permit re-opene clauses has long been sanctioned by EPA (as evidenced by its own *Technical Support Document* and its decision not to object to KDOW's March 19, 2010 issuance of numerous Section 402 KPDES Individual Permits), the Detailed Guidance states that "permitting authority should require the applicant to characterize the anticipated pollutant concentrations and loads using data from similar discharges and/or based on characteristics of local soils and geology " including from adjacent mine sites or from ambient data collected as part of the Section 404 or state Surface Mining Control and

Reclamation Act permit applications, and if none is available, that permitting authorities should collect the data themselves or could reject the application.  (*Id.* at 9).  A post-permit RPA with a permit reopener is not included among the options listed in the Detailed Guidance as available to permitting authorities for addressing RPAs for new or expanded discharges.  In sum, the Detailed Guidance concludes that "in general, an NPDES permit that fails to show evidence of a parameter-specific reasonable potential analysis will be inconsistent with the requirements of the CWA."  (*Id.* at 8).

59.    The Detailed Guidance also criticizes state permitting authorities for not incorporating provisions that would implement state narrative water quality standards, particularly relating to discharges that increase conductivity, total dissolved solids and sulfates.  Specifically, EPA contends in the Detailed Guidance that "scientific literature" should be considered relevant information in implementing narrative water quality standards, and that two such scientific reports – specifically the 2008  Pond-Passmore Study and a draft report by EPA titled *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams* ("the Draft Study") – have linked conductivity levels in streams below surface coal mining operations and adverse impacts to aquatic life in those streams.  (*Id.* at 5-6, 11).  According to EPA, these studies demonstrate that "conductivity impacts of projects with predicted conductivity levels below 300 µS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative water quality standards."  (*Id.* at 12).  The Detailed Guidance further directs Regions 3, 4 and 5 to work with state permitting authorities to "ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm."  (*Id.*).  It even directs regional offices to "object to issuance of [a]

proposed permit" if it fails to comply with the CWA "as noted" in the Detailed Guidance (*Id.* at 8).

60.     In essence, the Detailed Guidance establishes a presumption that any discharge which exceeds the 500 µS/cm conductivity level is violative of state narrative water quality standard for conductivity, including Kentucky's narrative water quality standard; and that effluent limits should thus be established for this pollutant.  EPA further concludes in the Detailed Guidance that most such effluent limits should be numerical, and that it is in only the most "limited cases" where it will be infeasible to establish a numerical effluent limit to implement a narrative water quality standard.  That EPA seeks to establish numerical effluent limits relating to conductivity (and other pollutants) is clear on the face of the Detailed Guidance, which notes that "[e]stablishing enforceable numeric limits for conductivity, selenium and other parameters in state Section 402 permits will help to improve water quality and better protect public health and aquatic life in streams downstream from Appalachian surface coal mining operations."  (*Id.* at 7).

61.     On April 2, 2010, James D. Giattina, Director of EPA Region 4's Water Protection Division, sent an e-mail to KDOW, attaching a copy of a letter, also dated April 2nd. (*See* April 2, 2010 Giattina E-mail and Letter, attached hereto collectively as Exhibit 7).  In the e-mail, Director Giattina referenced the Section 402 KPDES Individual Permits recently issued by KDOW without objection by EPA, and noted that EPA "will not be requesting further review of these permits" but would be "working with you to fully address our concerns under our regs for future permits."

62.     In the accompanying letter, EPA stated that the new permit requirements imposed by KDOW in the recently issued permits had not addressed all of EPA's concerns.  Despite

having failed to object to these permits just weeks before, it now characterized their contents --
increased effluent monitoring, WET testing, post-permit RPAs coupled with permit reopeners–
as deficient.  Of particular concern, according to EPA, was "the missing reasonable potential
analyses associated with narrative water quality standards and appropriate numeric effluent
limits associated with these standards, including but not limited to conductivity and total
dissolved solids."

63.    EPA specifically noted in this April 2, 2010 letter that it (the Region 4 ~~field~~
office) had now received the Detailed Guidance document from its national office, and that "the
issues that we raised in our recent comment letters are based on existing regulatory requirements
and are consistent with this guidance"; that it would "provide the framework that will assist
states in drafting Appalachian coal mining NPDES permits" and that reviews of "future draft
NPDES permits for coal mining will continue to emphasize the need for DOW to interpret
narrative water quality standards (including but not limited to conductivity and total dissolved
solids) to conduct reasonable potential analyses associated with narrative water quality standards,
and to include appropriate numeric effluent limits associated with those standards."  (*Id.*).

64.    EPA's use of the Detailed Guidance as a legislative-type rule was almost
immediate.  For example, on April 8, 2010 EPA sent a formal notice of objection to coverage
under the general permit for a Kentucky surface coal mine operator, citing the fact that the
general permit "does not include a reasonable potential analysis or an effluent limit for specific
conductivity."(*See* April 8, 2010 Letter, attached hereto as Exhibit 8).

65.     On or about April 16, 2010 KDOW posted 23 additional Section 402 KPDES individual permits for public notice and comment. On or about May 13, 2010, EPA issued Interim Objections to 12[5] of those permits, all of which were for surface coal mining facilities in Eastern Kentucky.  EPA claimed it lacked sufficient information to determine whether these draft permits met the requirements of the CWA. Among the information requested by EPA was an "adequate reasonable potential analysis," using data from adjacent mine sites or facilities or from ambient data collected as part of the Section 404, SMCRA or Kentucky Department of Natural Resources permit applications.  EPA told KDOW to consider "recent scientific studies developed by EPA" about conductivity and that "in-stream SC levels above 500 µS/cm are likely to be associated with adverse impacts that exceed narrative WQS."  Treating the 500 µS/cm limit as a presumptive water quality standard, EPA noted that if KDOW concluded that a higher level of conductivity would not violate Kentucky's narrative water quality standard, it must submit a detailed analysis and justification for its view.  (*See* May 13, 2010 Letter, attached as Exhibit 9).

---

[5]     EPA requested an extension of time to respond to the remaining 11 Section 402 KPDES permits, and ultimately it did not object to them.  Notably, none of these 11 permits were for surface coal mining facilities in Eastern Kentucky and thus subject to the Detailed Guidance.

66.     On September 16, 28 and 29, 2010 in 11 virtually identical letters,  EPA issued final objections to 11 of the 12 pending draft permits, all of which involved surface coal mining facilities in Eastern Kentucky subject to the Detailed Guidance[6].  According to EPA, its:

> "[O]bjections relate to KDOW's failure to  conduct an adequate reasonable potential analysis (RPA), in accordance with 40 CFR § 122.44(d), to determine whether the proposed discharge will cause, have the reasonable potential to cause, or contribute to a violation of state water quality standards (WQS), and KDOW's failure to include in the permit effluent limits necessary to ensure that the proposed discharge will not cause or contribute to a violation of WQS, as required by the CWA §301(b), 40 CFR § 122.4(a) and (d), and 40 CFR 122.44(d)(1) . . . [and] . . . consider…the emerging science regarding the impacts of coal mining on water quality" citing the Pond-Passmore Study and the Draft Report.

(*See,* September 28, 2010 EPA Objection letter, attached hereto as Exhibit 10).

67.     Specifically, EPA objected to the 11 permits because it concluded that KDOW had not conducted an adequate RPA for certain pollutants, including conductivity (SC), total dissolved solids (TDS) and sulfates.  (*See* Objection letter, Exhibit 8, at p. 3-4).  EPA noted that where site-specific data is unavailable, KDOW can: obtain data for these RPAs from adjacent mining facilities or from the ambient data collected as part of the Section 404 or SMCRA permit applications; can independently gather the data; or can reject the application. These are the same directives included in the Detailed Guidance.  (*See,* Exhibit 3, Detailed Guidance at 9).   EPA specifically rejected KDOW's longtime approach of conducting post-permit RPAs discharges for which there is no site-specific data (an approach it did not object to in the weeks immediately preceding issuance of the Detailed Guidelines) as "inconsistent with the CWA" because of "existing information regarding the relationship between the coal mining discharges and water

---

[6]     The remaining 2 permits were for coal preparation plants which are not subject to the Detailed Guidance.

quality impairments, together with available information regarding the effluent and receiving streams."[7]  (*See* Exhibit 8, Objection letter,  at p. 4, n. 5).

68.    EPA also objected to these permits because they failed to include numerical effluent limits to implement Kentucky's narrative water quality standards.  According to EPA, KDOW must submit a revised permit which includes effluent limits for any pollutant for which there is a reasonable potential for the discharge to cause or contribute to an excursion above a water quality standard.  (*Id.* at 6).  In the Detailed Guidance, EPA concluded that "the available science will demonstrate that there is a reasonable likelihood" that discharges involving conductivity levels above 500 µS/cm will violate state water quality standards, irrespective of the RPA's findings.  (*See*, Exhibit 3, Detailed Guidance at pp. 8, 11-12).  EPA's objection to the 11 permits is thus based, in part, on the failure of KDOW to include numerical effluent limits on conductivity as a condition of the permit.

69.    While the objection letters did not specifically cite by name the Section 402 NPDES program changes mandated by the Detailed Guidance, EPA's Region 4 used the Detailed Guidance – its scientific conclusions, presumptions and directives – in responding to KDOW and objecting to the 11 Section 402 KPDES permits on or about September 16, 28, and 29, 2010.

_____

[7] The Division of Water's Permitting Procedures for Determining "Reasonable Potential", which were approved by EPA in 2000, state that where reasonable potential does not exist, or sufficient data does not exist to make a determination, it may be desirable to require "monitor only" as an interim measure to provide for collection and evaluation of necessary data prior to the determination of an appropriate limitation. KDOW considers "sufficient data" to be five (5) or more data points. While most effluents exhibit a lognormal distribution as shown in EPA's Detailed Guidance, KDOW has chosen not to assume any coefficient of variation for a data set, regardless of size. A single data point shall be evaluated against what limits might be required as a single data point. However, this evaluation may not be the end point in the RPA. KDOW has consistently implemented this guidance with EPA's knowledge and concurrence.

70.     That EPA relied upon the Detailed Guidance in objecting to the 11 Section 402 KPDES permits is clear when comparing the directives of the Detailed Guidance and the objections themselves to the EPA's actions prior to April 1, 2001 when the guidance was unveiled.  The Detailed Guidance directs its regional offices that there is sufficient scientific evidence for them to presume that conductivity levels exceeding 500 µS/cm will have a reasonable likelihood to violate state water quality standards and that high levels of conductivity, total dissolved solids and sulfates have a reasonable likelihood to damage aquatic life. It directs EPA Regional Offices that, because of these presumptions, states should be performing RPAs for new surface mine facilities at the time of permit issuance using existing data from adjacent mine sites, or failing that, they should reject the application.  It also directs Regional Offices that the scientific studies linking high conductivity with impairment of aquatic life themselves should be sufficient to require the states to impose numerical effluent limits for this pollutant. (*See*, Exhibit 3, Detailed Guidance, pp. 7-12). EPA's objections to the 11 Section 402 KPDES permits incorporates these Detailed Guidance directives.

71.     EPA's reliance upon the Detailed Guidance for its post-April 1, 2010 objection to Section 402 KPDES permits is also clear when comparing it to EPA's actions prior to April 1st. EPA did not object to the Section 402 KPDES Individual Permits issued two weeks before publication of the Detailed Guidance. After publication of the Detailed Guidance, EPA found permits containing the identical permit conditions inconsistent with the CWA. Clearly, EPA's abrupt program changes stem from the Detailed Guidance.

72.     EPA's use of or reliance upon the Detailed Guidance in (i) establishing a presumption concerning the level of conductivity (SC) which is likely to violate Kentucky's narrative water quality standards; (ii) rejecting a post-permit RPA for conductivity, total

23

dissolved solids and sulfates based on site-specific data (coupled with a permit reopener clause) for new or expanded surface coal mine facilities in Eastern Kentucky and instead requiring an RPA at the time of permit issuance using non site-specific data; and/or (iii) compelling the Cabinet to establish numerical effluent limits for conductivity, is arbitrary and capricious.

73.     The Detailed Guidance has all the hallmarks of a legislative rule: it was promulgated at the national headquarters; it was characterized as "effective immediately"; and program oversight actions in the Regional Offices are now based upon policy interpretations in this document.  EPA's use of and reliance upon the Detailed Guidance after April 1, 2010 in objecting to the coverage of new or expanded Kentucky surface coal mine operations under the general permit, and in the  11 Section 402 NPDES  individual permits, demonstrates that EPA is using the Detailed Guidance as a legislative rule. EPA's failure to subject this new rule to formal notice and comment rulemaking violates federal law.

74.     Through its Detailed Guidance, EPA is attempting to either (i) establish a new water quality standard for conductivity on its own (which it cannot do absent notice and comment rulemaking pursuant to 33 U.S.C. § 1313(c)(4)) or (ii) halt the issuance of any Section 402 KPDES permit by KDOW to Kentucky state surface coal mining operators until the state establishes a new numerical water quality standard for conductivity which comports with the Detailed Guidance's presumption that conductivity levels of 500 µS/cm will violate existing narrative water quality standards; or (iii) failing that, to wrest control over Section 402 KPDES permitting from the Cabinet/KDOW so as to eliminate mountaintop removal as a method of surface coal mining in Kentucky and other Appalachian states.  This attempt to usurp proper state authority over Section 402 permits is arbitrary and capricious, and otherwise violates the CWA and the APA.

24

75. EPA's use of the Detailed Guidance has to date caused, and will in the future cause, indefinite delays in the Section 402 KPDES permitting process, and/or has prevented and will prevent issuance of such permits altogether, causing significant injury to the Commonwealth and its citizens due to loss of wages, business opportunities, and taxes, and overall economic chaos particularly in Kentucky's eastern Appalachian region.

76. The Commonwealth has commenced this action seeking (i) a declaration that EPA's use of the Detailed Guidance in making decisions on Section 402 KPDES permits is contrary to federal law, and (ii) an injunction preventing EPA from continuing to utilize the Detailed Guidance in such permitting decisions.

77. EPA's actions were taken outside of formal rulemaking procedures and amount to *de facto* substantive rule changes in violation of the Administrative Procedures Act. The Detailed Guidance constitutes final agency action because it has been and continues to be used as the standard by which EPA makes decisions regarding, comments on, and objects to Kentucky's NPDES permits for coal mining operations.

78. Those extra-regulatory actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because they have invaded and usurped the authority of the Commonwealth of Kentucky to develop water quality standards under CWA Section 303, 33 U.S.C. § 1313 and the administration of the National Pollutant Discharge Elimination System ("NPDES") permitting program under CWA Section 402, 33 U.S.C. § 1342. In the Clean Water Act, Congress clearly provided that States have the primary responsibility and right to prevent, reduce, and eliminate water pollution, to plan the development and use of water resources, and to

consult with the EPA Administrator, *see* 33 U.S.C. § 1251(b); EPA has wholly disregarded that directive.

79.     Pursuant to 28 U.S.C. § 2201, there is an actual, justiciable controversy between the parties for which this Court has jurisdiction to declare the rights and legal relations of the parties.  Plaintiff Commonwealth of Kentucky respectfully requests that this Court declare that:

(i)     The Detailed Guidance amounts to a legislative rule and EPA has violated 5 U.S.C. § 553 of the APA in failing to subject it to the procedural requirements of public notice and comment rulemaking; and/or

(ii)    EPA's presumption in the Detailed Guidance that water conductivity exceeding 500 µS/cm will likely cause an excursion which will violate state water quality standards (including Kentucky's narrative water quality standard for conductivity) amounts to adoption of a new water quality standard and that the adoption of such a standard without public notice and comment rulemaking violates 33 U.S.C. §1313(c)(4) of the CWA; and/or

(iii)   EPA's actions in adopting and using the Detailed Guidance to usurp the rightful role of the Commonwealth to establish and police state water quality standards, and which has the effect of delaying or halting the issuance of Section 402 KPDES permits for surface coal mining facilities in Eastern Kentucky, is arbitrary and capricious, violates 5 U.S.C. §706(2) of the APA and should be set aside.

80.     The Commonwealth of Kentucky as a delegated state under the CWA is primarily responsible for setting and interpreting water quality standards, for  administering the NPDES program in the Commonwealth, and to monitor and protect the quality of the State's streams and the aquatic ecosystems therein; the reliance by EPA on the Detailed Guidance to unilaterally

change Kentucky's ability to administer it's delegated program is arbitrary and capricious and otherwise violative of the Fifth Amendment guarantee of due process;

81.     EPA's actions violate the 10th Amendment guarantee of the right of the states and the people to be free from the mproper exercise of federal power.

82.     The Detailed Guidance issued by EPA unilaterally changes rules for NPDES permits without the proper public notice and comment rulemaking as required by federal law. Until such time as EPA undergoes the proper rulemaking process the rules set forth in the Detailed Guidance are not properly promulgated and the powers usurped by EPA through the Detailed Guidance are prohibited by the 10th Amendment of the United States Constitution.

83.     Intervening Plaintiff further invokes, pursuant to 28 U.S.C. § 2202, the power and authority of the Court to enter orders for further necessary or proper relief based on a declaratory judgment, including injunctive relief and demands the Court find and order that:

84.     EPA has delayed and now blocked the issuance of Section 402 KPDES permits required for operation of new and/or expanded surface coal mines in Eastern Kentucky, until and unless (i) Kentucky performs an RPA using non site-specific data from other mine sites before issuance of the permit and demonstrates that conductivity levels in new discharges will not exceed 500 μS/cm; or (ii) Kentucky develops numerical effluent limits for conductivity.  EPA's actions are designed to delay and impede the issuance of any new surface coal mine in Eastern Kentucky and are arbitrary, capricious and illegal.

85.     The Commonwealth of Kentucky will be irreparably harmed unless Defendants are enjoined from imposing unpromulgated rules and usurping the authority of the Commonwealth to establish and implement water quality standards within its borders.

86.     The welfare of the citizens of the Commonwealth of Kentucky will be irreparably harmed unless Defendants are enjoined from unlawfully objecting to NPDES permits for coal mining operations within its borders.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, Intervening Plaintiff, Commonwealth of Kentucky, prays this Court for the following declaratory and injunctive relief:

For an order declaring that:

1.     EPA is using the Detailed Guidance as a binding legislative rule in making Section 402 KPDES permit decisions without instituting public notice and comment rulemaking procedures in violation of the APA.

2.     EPA's  objection to Kentucky's NPDES permits containing the same limits and conditions that it approved prior to issuance of the Detailed Guidance is arbitrary and capricious and otherwise violative of the Fifth Amendment guarantee of due process.

3.     EPA's  objection to Kentucky's NPDES permits on the basis of the Detailed Guidance without public notice and comment rulemaking violates the APA and the 10th Amendment rights of the Commonwealth .

4.     EPA's requirement that Kentucky apply an unpromulgated water quality standard to NPDES permits is contrary to the authority to establish and implement water quality standards given to the states in violation of the Clean Water Act. and the 10th Amendment rights of the Commonwealth.

5.     The Detailed Guidance is contrary to the Clean Water Act, or is otherwise arbitrary, capricious, or an abuse of discretion for the reasons discussed herein, and has caused

undue delay in coal mining discharge permit review and issuance affecting Kentucky permits at the federal and state levels;

6.      The Detailed Guidance has infringed upon the authority of the Commonwealth of Kentucky to set and interpret water quality standards, to administer NPDES permits, and to monitor and protect the quality of the State's streams and the aquatic ecosystems therein;

Intervening Plaintiff, Commonwealth of Kentucky, further prays this Court for an order:

7.      Permanently enjoining and restraining Defendants from utilizing the Detailed Guidance in its oversight of Section 402 KPDES permit decisions, and from implementing the significant changes to the Section 402 KPDES program discussed in the Detailed Guidance unless and until it complies with federal law and/or public notice and comment rulemaking. Specifically, Intervening Plaintiff asks the court to enjoin and restrain EPA from (i) requiring KDOW to perform a pre-permit Reasonable Potential Analysis for conductivity, total dissolved solids or sulfates for new surface coal mining facilities in Eastern Kentucky using data from adjacent mine sites, as opposed to a post-permit RPA coupled with a permit reopener using site-specific data; and (ii) from requiring KDOW to develop numerical effluent limits for conductivity until it performs a post-permit RPA for these pollutants using site-specific data and, only then, if KDOW determines that based on this RPA that such limits are required to implement Kentucky's narrative water quality standards.

8.      That the Court grant such other and further relief as may be proper.


Respectfully submitted,

ENERGY AND ENVIRONMENT CABINET

29

/s/Mary Stephens
C. Michael Haines
Mary Stephens
Josh Nacey
Office of General Counsel
200 Fair Oaks Lane, First Floor
Frankfort, Kentucky 40601
Telephone No. (502) 564-3410
Facsimile No.   (502) 564-9003

COUNSEL FOR INTERVENING PLAINTIFF